# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:22CR10271 |
| | ) | |
| CATHERINE LEAVY | ) | |

### Sentencing Memorandum of Catherine Leavy

When Catherine speaks about the call she regrettably made to Children's Hospital on the evening of August 22nd, 2022, her eyes well with tears. The remorse she embodies is deep and genuine. Reflecting on the call, she says, "**It's not who I am, nor do I wish any harm upon anyone, ever. Hospitals do amazing things for people**."

The 12 seconds it took for Ms. Leavy to place the call to Children's undoubtably mark the most extremely out of character moments of Ms. Leavy's thirty-eight years of life. Ms. Leavy is a vulnerable, sensitive, and loving woman who suffers from long-term mental illness and developmental disabilities of limited intellect and deficits in her cognitive and social skills. *PSR* at ¶¶ 46-48. She has been receiving mental health treatment since she was five years old. *Id.* Unable to live or support herself independently in the long term, she has resided in her family home in Westfield, Massachusetts with her parents since childhood. *PSR* at ¶ 43. She loves animals, children, puzzles, and gardening and has no history of any type of violent or threatening behavior whatsoever. Catherine has never before been convicted of a crime, let alone served even a day of an incarcerated sentence, and she has no history *whatsoever* of espousing or endorsing *any type* of hurtful or discriminatory thinking or behavior. *See PSR* at ¶¶ 7-14; *PSR* at p. 22 (defense objection 1).

Ms. Leavy feels the full weight of the serious crime she committed and harbors no type of animus or harmful beliefs against anyone – let alone members of the Transgender or LBGTQ+ communities. She is embarrassed and ashamed by her actions. In her own words, she says, "**I feel horrible for what I did. It had a big interruption on society. I feel so bad for what people in the hospital had to deal with. If they allowed me to help or volunteer in the hospital I would**." *Sarah Coughlin Clinical Evaluation and Report of Catherine Leavy, September 8, 2023,* p. 3, attached as *Exhibit A.*

Catherine unquestionably understands the wrongfulness of her behavior. However, her developmental disabilities and mental illness at the time of the incident compromised her judgment, cognition, and ability to function in the world. These documented disabilities in no way excuse Catherine's criminal conduct but they do provide a crucial context in which to understand her crime and assess her degree of moral culpability. Catherine's disabilities also make her uniquely ill-equipped to endure incarceration – as a carceral environment would inflict acute psychological distress and long-term damage on her, while making her extremely vulnerable to exploitation, violence, and abuse from others.

In view of Ms. Leavy's substantial mental health and cognitive disabilities and needs, and because her conduct in this case was the product of unique circumstances that are unlikely to recur provided she remains compliant with her current psychiatric and mental health care, Ms. Leavy requests that the Court impose a sentence of 12 months of probation.[1] Such a sentence

---

[1]     Should the Court determine that a more punitive sanction is necessary, Ms. Leavy asks the Court to consider a period of home confinement in lieu of incarceration. As is noted in the presentence report, Ms. Leavy's advisory guideline sentencing range falls in Zone C. *PSR* at 59. However, Ms. Leavy maintains that home confinement is unnecessary and impractical in view of her success thus far on pre-trial release for the last 21 months (*see PSR* at p.1), her ongoing mental health needs, and her present living situation.

would represent only a modest variance from the undisputed advisory guideline sentencing range of 12-18 months and is manifestly sufficient but not greater than necessary to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

### 1. Ms. Leavy's lifelong mental health challenges

Licensed Clinical Social Worker Sarah Coughlin, LICSW, LACD-I, has conducted multiple clinical evaluation of Ms. Leavy, and her reports are attached to this memorandum as *Exhibits A and B*. LICSW Coughlin documents, in detail, Ms. Leavy's pervasive mental health history and psychological and psychiatric diagnoses, which include, among other things, a generalized anxiety disorder, major depressive disorder with psychotic features, a panic disorder, a social anxiety disorder and agoraphobia, and ADHD. Her mental health records further indicate her intellectual disabilities. *Exhibit A,* p. 2*; Sarah Coughlin Supplemental Clinical Evaluation and Report of Catherine Leavy, June 15, 2024,* p. 1, attached as *Exhibit B; see also PSR* at ¶ 46 (documenting Ms. Leavy's mental health history).

From an early age, Catherine's mental health and development challenges severely impacted her functionality. As a preschooler, she began exhibiting symptoms of extreme anxiety, manifesting in her refusal to leave her home or go to school. *Exhibit A*, pp. 1-2.  She was placed in counseling at age five, and by age eleven, due to worsening anxiety, paranoia, and depression, was started on pharmacological treatment with anti-depressants. *Id*. Throughout her time in school, Catherine was diagnosed with several learning disabilities, received special education services, and was put on an Individualized Education plan. *Id*; *see also PSR* at ¶ 55. However, she was often removed from school by her family and home schooled when her anxiety became too debilitating for her to function in a regular school environment. *Id*. Despite her many

challenges, Ms. Leavy was able to graduate from high school but has lived at her family home, supported by her parents, for her entire life. *Exhibit A*, pp. 1-2; *PSR* at ¶ 43.

For over 37 years, Catherine has remained a law-abiding and positive member of her community. Despite her unquestionable challenges, she has overcome many hurtles in her life. Although Catherine's agoraphobia and anxiety disorders cause her frequent heart palpitations and mild chest pains - easily overwhelming her if there is much to do in a day and making the demands of formal employment unmanageable for her – throughout her adulthood she has been a positive contributor to her community – working part-time on a family friend's farm and is trusted by neighbors to regularly care for chickens, dogs, and children. *Exhibit A*, pp. 1-2; *PSR* at ¶ 56.

### 2.  Ms. Leavy's mental health struggles in August 2022

Of the myriad tragedies brought on by COVID-19 – one was the pandemic's heavy toll on mental health. National Institute of Health data and public health research confirm that rates of anxiety, depression, and mental illness increased exponentially during the pandemic.[2] For vulnerable individuals with previously diagnosed serious mental illness, the stress, uncertainty, fear, and isolation ushered in by the pandemic lead to significantly higher levels of psychiatrist distress and symptom severity.[3] Tragically, in the face of such increasing mental health need, pandemic lockdowns and restrictions, the disruption of medical care, and the shortage of mental

---

[2]   Association of American Medical Colleges, *A growing psychiatrist shortage and an enormous demand for mental health services*, available at: https://www.aamc.org/news/growing-psychiatrist-shortage-enormous-demand-mental-health-services

[3]   Journal Of Community Psychology, *The effects of sustained COVID-19 emergency and restrictions on the mental health of subjects with serious mental illness: A prospective study*. Available at: https://pubmed.ncbi.nlm.nih.gov/35615854/

health providers limited the ability to access mental health care for people who needed it the most.

Like many others, Catherine experienced the Pandemic's collateral mental health damage firsthand. *See PSR* at ¶ 46. She weathered the extreme isolation and lack of mental health treatment brought on by COVID-19, enduring an extraordinary level of stress and fear which unsurprisingly exacerbated her life-long mental health symptoms. *Exhibit A*, p.2. By the summer of 2022, Catherine's paranoia and anxiety had reached an all-time high. She was isolated at home and had stopped receiving in-person mental health treatment. *Id*. As reported in LICSW Coughlin's evaluation, by August 2022:

> "**[Catherine] became emersed in online media influences and was incredibly paranoid and fearful of getting vaccinated. Her family was concerned with these beliefs, which were a constant point of conflict between her and her only support network at that time. She began isolating and digging deeper into the QAnon internet conspiracy theories and messaging and quickly began decompensating. Due to the shutdown, she had no mental health providers or supports during that time. Reports indicate her family called the mental health crisis team several times during COVID-19 pandemic, but that the evaluators did not find Ms. Leavy to be a danger to herself or others and no services were put in place. Her parents were at a loss of what to do and called Ms. Leavy's doctor and informed her that she was being erratic and paranoid. Her doctor spoke with [Catherine] over the phone and reportedly prescribed her [mental health medication] without a full evaluation. [Catherine's] symptoms persisted, and her dosage was increased [..].**"

*Id.*

It was at this time, after undergoing a significant medication change and increase, isolated within her family home with no mental health providers or external supports, that Catherine's mental decompensation reached its height. Unfortunately, her worsening symptoms and increased paranoia and anxiety made her increasingly vulnerable to the toxic and manipulative online conspiracy theory rhetoric. Her continued isolation and obsessively paranoid internet surfing led her down into the dark recesses of online misinformation – and straight into

the dangerous and hateful disinformation espoused by the "Libs of TikTok"[4] twitter account and echoed on-line by other misinformation social media accounts– all of whom instigated and spread "an orchestrated campaign of disinformation to threaten and intimidate [Children's] Hospital and its doctors and staff from proving gender-affirming care." *See Boston Children's Hospital Impact Statement*, p.2, attached as *Exhibit C*. In posting such manipulative hateful misinformation against Boston Children's Hospital, the instigators of the disinformation campaign against BCH sought to prey upon, and mislead, vulnerable people into believing their lies. Catherine, was, unfortunately, one of those people.

Catherine's exposure to the destructive and manipulative messaging spewed by these toxic social media accounts could not have come at a worse time. Vulnerable, dysregulated, and acutely mentally ill, she lacked the ability to appreciate the falsity of the disinformation claims. In her compromised and mentally disorganized state, she was unable to meaningfully discern that the false claims of Children's performing gender-affirming surgeries on young children were actually manipulatively masked hateful, transphobic and antiLGBTQ+ messaging. Instead, Ms. Leavy unwittingly read the misleading posts literally – and taking it at face value - believed it to be fact. Believing the claims were actually revealing the truth about the harmful treatment of Children's patients, Catherine's exposure to this noxious disinformation was tragically the impetus to her split second, impulsive placement of her August 22nd call to the Hospital.

---

[4]     Beginning in early 2022, the "Libs of Tik Tok" twitter account, run by Chaya Raichik, began intentionally promoting dangerous and intentionally false and misleading disinformation and lies about gender-affirming care and treatment at Boston Children's Hospital. Spreading (among other untruths) intentional disinformation that 'young girls' under 18 were receiving 'gender-affirming hysterectomies' at Boston Children's – the Libs of Tik Tok account's lies were then repeated, compounded on, and spread over the internet and social media by other users and platforms. *See* https://glaad.org/meta-and-twitter-refuse-action-libs-tiktok-posts-doctors-and-staff-boston-childrens/; See also *Exhibit C, Boston Children's Hospital Impact Statement*, pp. 3-6 (thoroughly documenting the disinformation campaign against BCH).

It is critical to note that Ms. Leavy has never in her life harbored any type of ill will or discriminatory sentiment towards members of the transgender, non-binary, and LGBTQ+ communities. Nor has she ever behaved in a violent or aggressive way, or endorsed views or actions that condone violence. And now, stable in her current mental health treatment and psychiatric care, when Ms. Leavy reflects on her call, she has stated, "**[w]hen they played that for me, I couldn't believe it was even me on that phone**," she stated. "**I don't hate anybody and would never hurt people like that**." *Exhibit A*, p. 2.

### 3.   Ms. Leavy's Participation in Restorative Justice

Ms. Leavy has been genuinely motived to repair the harms she has caused in making the false call. *Id*. at 4. Advancing this goal, Catherine applied for and participated in a rigorous restorative justice program run by Communities for Restorative Justice ("C4RJ") -  a nonprofit partnership of 32 communities, their police departments, and District Attorneys offices that uses a restorative justice circle process to help individuals to understand the harm they have caused and hold them accountable and changes the aftermath of a crime for people and communities who have been harmed.[5] The restorative justice process has been a monumental learning experience for Ms. Leavy, who, after completion of the program, has said "**I can finally look at myself in the mirror again**." Ms. Leavy's restorative justice circle included nurses from Boston Children's who were working, and significantly impacted, with the Hospital went into lockdown after Catherine's call. Their presence and participation in Catherine's restorative justice work

---

[5]     Restorative justice puts the responsible parties in a position to take an active role in repairing the harms done, and in making things better. C4RJ is governed by a Board of Directors and advised by their Police Council. They have a recidivism rate of just 16%. In addition to that measure, they also track victim satisfaction rates, which hover at 90-92%. Hundreds of similar programs across the country have documented similar success. C4RJ's website is available at: https://www.c4rj.org/about-us/welcome

was an incredibly impactful and profound experience for Ms. Leavy and for all the parties involved.

Catherine's participation in the RJ process with C4RJ begin in September 2023. After completing an intake, Ms. Leavy met with C4RJ staff and training facilitators, to prepare for an Opening Circle. The Opening Circle, held in March 2024, included Ms. Coughlin, C4RJ trained facilitators and staff, LICSW Sarah Coughlin, and two affected nurses from Boston Children's. *Exhibit B*, p. 3. Ms. Leavy's work in this restorative justice process included taking responsibility for, and discussing her actions that caused harm, describing the incidents that led to her call to Children's, discussing her mental state at the time of her behavior and taking full accountability for her actions. Through this process, Children's Hospital nursing staff and others were able to share the harm Ms. Leavy's behaviors caused, including forcing the Hospital to go into lock down and the fear and loss of safety and security it caused to the entire hospital communities, its staff, patients, and families. From the affected parties from Children's, Ms. Leavy was also able to learn about the life-saving gender affirming care at BCH. *See Exhibit C*, pp. 6-7.

Ms. Leavy was profoundly impacted by the restorative process and throughout it was able to express her deep remorse for the harm she caused. As she now reflects, it breaks her heart to hear the impact her behavior and her call had on the Hospital. As she says in her own words, she believes hospitals are so important and she admires the work they do, "**day in and day out**" to "**help sick children**", and she carries extreme amounts of guilt and shame for the disruption she caused Children's. Recognizing the earnest and sincere efforts of Ms. Leavy during the Restorative Justice process, Boston Children's has recognized that Ms. Leavy, herself, was "manipulated by an orchestrated disinformation campaign targeting pediatric gender-affirming

care" and that "it was the instigators' campaign that led Ms. Leavy to make the bomb threat to BCH." *Exhibit C*, p. 6.

After the Opening Circle's completion, the Restorative Agreement was finalized by the participating parties, requiring Ms. Leavey to 1) participate in weekly meetings with C4RJ facilitators; 2) complete 8 hours of community service; 3) write an apology letter to the nursing team who would share it with the entire BCH Unit; 4) continue her engagement with her mental health and psychiatric treatment; and 5) create a piece of artwork for the Hospital unit. *Exhibit B*, p. 3.

Over the next month, Catherine worked incredibly hard, never missing a weekly meeting with the C4RJ facilitators, going "above and beyond to complete the Restorative Agreement", "com[ing] prepared each session" and "complet[ing] each homework assignment that was asked of her". *Id*. at pp. 3-4. Catherine diligently finished her community service hours at a local farm, and reflecting on this assignment, has said "**I enjoyed giving back to the community**," and reflecting, "**[i]t's really hard work but it's sort of like a circle of life kind of thing and it made me feel good to give my time and energy to this work without getting paid for it**." *Id*. She spent considerable time on her apology letter, a difficult assignment for her given how overwhelming she felt while writing it. However, she was able to ask for help from C4RJ staff and was able to articulate and write the points she wanted to make, reflecting that, "**I cried a lot when I was writing because I felt so bad**," "**I really do feel so bad for what I did. I am so sorry**." *Id*.

Throughout this time, Ms. Leavy continued weekly one-on-one mental health and psychiatric treatment with her mental health care providers, and as LICSW Coughlin notes, "this evaluator's review of her therapy records confirm her active engagement and progress in

treatment up to the present date". *Id.* at 4; *see also PSR* at ¶ 47. Finally, Ms. Leavy spent months working on a beautiful piece of artwork for Children's. Choosing a "Tree of Life" image, Ms. Leavy explained that for her, the artwork symbolized growing and learning and spoke about how much this restorative justice process really helped her grow. "**I chose bright colors for the kids. I wanted them to see happiness and rainbows and it is really eye-catching**," Catherine expressed "**I wanted to show those kids that I care about people's lives and that I don't want anyone getting hurt**", reflecting that "**painting is a good coping skill for me, and it's also not about instant gratification, it takes a long time and it's going to a place that really deserves it for all the help that they give sick children, so it makes me feel good**." *Exhibit B* at 4.

April 12, 2024 marked the Closing Circle. Ms. Leavy addressed what she had learned about herself through the process and went over her completed assignments within the Restorative Agreement. In a life changing way, Catherine's participation in this restorative justice process developed her understanding of the harm she has caused, while holding her accountable for her behaviors and giving her the opportunity to actively repair the harms she has caused. *See C4RJ Completion Memo*, attached as *Exhibit D*. Unquestionably, Ms. Leavy's participation in a rigorous restorative justice process granted her the ability to not only consider the role of community on her life but the impact she had on communities, both in her offending and in her efforts to repair her harm through the RJ process. Through this process she was able to learn how she can be a source of positive change for others and heal the harm she caused in the broader community. Although not an easy process for Ms. Leavy, through it she was able to "fac[e] difficult emotions, tak[e] full accountability, and agre[e] to a process to repair the harm" all the while engaging in a process that was ultimately "healing for all parties". *Exhibit B* at 4.

Perhaps unsurprisingly, this invaluable restorative justice work has been shown to successfully reduce recidivism and promote positive outcomes in offenders.[6]

### 4. <u>Similar Cases</u>

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). Ms. Leavy's request to resolve this case with probation finds support in the resolution of other, similarly charged defendants, who, facing similar offense conduct as Ms. Leavy, have received sentences of probation or have even resolved their cases through less punitive measures - avoiding a criminal conviction altogether with pre-trial diversion.[7]

---

[6]      Research has found that the restorative justice practices reduce recidivism among offenders engaged in restorative justice work and programs. *See Research on Restorative Justice Practices*, Justice Research and Statistics Association, December 2022, available at: https://www.jrsa.org/pubs/factsheets/jrsa-research-brief-restorative-justice.pdf.

[7]      Counsel for Ms. Leavy has identified the following cases where similarly situated defendants (with offense conduct that encompasses longer periods of time, multiple instances of repeated threating behavior, and/or involves more specific and violent threats and risk factors) were permitted by the U.S. Attorney's office to resolve their cases through pre-trial diversion and avoid a federal criminal conviction altogether. They include:

•      Shawn Richardson, 1:19-mj-07426-JCB: Mr. Richardson was charged by way of complaint with Telephone Threat to Injury by Means of an Explosive, in violation of 8 U.S.C. s. 844(e). Mr. Richardson was alleged to have made threats – both by phone and in person – to the Internal Revenue Service, including specific threats to bomb the IRS office in Lowell, MA. Specifically, he told the IRS, in a recorded phone call: "I have not made it yet, I have to go to Home Depot and get some Nitro and get a few other things. And then deposit it myself and then blow myself up with the bomb because it doesn't really matter." See D.E. # 1-1, Complaint Affidavit. When confronted by law enforcement at his door, Mr. Richardson refused to open his door and instead spoke with a special agent for the Treasury Inspector General for Tax Administration ("TIGTA") by phone. During that call, he said that "he did not currently have a bomb but that he would make one and blow up the IRS." *Id*. He later reiterated his threat to use a bomb to blow up the IRS, and the TIGTA special agent said that he was "resolute in destroying the IRS and killing its employees." Once law enforcement was finally able to enter his home and attempted to dissuade him from making threats, Mr. Richardson said that "what the IRS did to him was a crime, and that he would continue to seek retribution through violence, as his only option." *Id*. Mr. Richardson had been drinking heavily during this time. After being federally

charged, Mr. Richardson continued contacting the IRS, and earlier evidence of hostile communications to other government agencies surfaced but were not prosecuted. Mr. Richardson's case was not indicted and was ultimately resolved by way of a twelve-month term of pretrial diversion, culminating in dismissal in June 2021. See D.E. # 24-25.

•    Timothy Janvrin: In 2017, Mr. Janvrin received a target letter from AUSA Lori Holik, who alerted our office and Assistant Federal Defender Scott Lauer was appointed. Mr. Janvrin was under grand jury investigation for threats in violation of 18 U.S.C. s. 875(c), after he threatened Republican politicians via Twitter during the Obamacare repeal effort in the summer of 2017. Some of these threats – sent repeatedly over a period of eight days, included: "I hope someone goes to the Capital (sic) today and starts shooting Republicans and get this Civil War started enough of the BS talks Civil War"; "Shoot all Republicans in your Neighborhoods if we can't reach the Congressman we can reach the people who voted them in DEATH TO REPUBLICANS"; "Put a bullet in Trey Gaudi (sic) his fucking head (sic) little f----t with the fucking pinhead"; and "Kill STEVE BANNON HE NEEFS (sic) TO BE KILLED ANYWAY HANG HIM FROM ANY TREE FROM DC." There was evidence that at the time he was alleged to have made these threats, Mr. Janvrin was drinking heavily and had medical and mental health issues, which included depression and anxiety, and which contributed to impulsivity and difficulty coping with stress. His treating doctor assessed Mr. Janvrin to be a "low risk" to others. He was never formally charged and the investigation into his case was diverted.

•    Nadia Mohamed, 1:22-mj-00127-AJ (D. NH): Ms. Mohamed was charged by way of complaint with violating 18 U.S.C. s. 875(c) for sending threatening emails to lawyers representing an insurance company she believed had mishandled her accident claim. Notably, even after being warned by a Nashua Police officer in person and by written court order that further threats would be prosecuted and she could be subject to incarceration, Ms. Mohamed sent over eighty emails to counsel for the insurance company, some of which contained threats to injure them personally. See D.E. # 1-1 (Complaint Affidavit). Ms. Mohamed made continued threats to harm counsel even after an FBI agent personally spoke with her about her earlier threats. Some of these threats included: "I'm gonna fucking kill you there's the response to your motion"; "GONNA COME CASTRATE YOU KILL YOUR CHIKDREN (sic) AND FAMILY"; "Gonna start with [M.B.] and nice slow death with my bare hands. Take your protective order and shove it up your ass. Gonna strangle the cunt with my bare hands." Id. Ms. Mohamed, who told the FBI agent that she could not control herself, suffered from mental health issues, and her case was ultimately dismissed without prejudice. See D.E. # 23.

•    Eldo Kim, 1:14-cr-10301-NMG: Mr. Kim was charged by complaint with violating 18 U.S.C. §1038(a) for making five simultaneous bomb threats to various personnel and offices at Harvard University. See D.E. # 1-1 (Complaint Affidavit). Notably, Mr. Kim stated in the bomb threats that "shrapnel bombs" were placed in the "science center, sever hall, emerson hall, thayer hall", and wrote "2/4. guess correctly. be quick for they will go off soon". Id. Each of the four buildings where Mr. Kim had claimed bombs were placed were evacuated immediately, and in sending the bomb threats, Mr. Kim took steps to conceal his identity by using a temporary and anonymous email address from which to send the threats and used TOR to mask his IP address. Mr. Kim, a student at Harvard, admitted he sent the bomb threats in an attempt to avoid a final

Individuals with serious mental illness and intellectual disabilities, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses....do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Atkins v. Virginia*, 536 U.S. 304, 306 (2002). This district, appreciating that a defendant's psychological and emotional conditions often warrant a downward departure, have repeatedly sentenced defendants with serious psychiatric and mental health conditions to terms of probation for similar offense conduct.

- In *United States. v. Frisiello,*[8] Dkt. No. 1:18-cr-10314-NMG, the defendant, convicted on six counts of 18 U.S.C. § 1038 (False Information and Hoaxes Related to Purported Biological Weapons) and eight counts of 18 U.S.C. § 876(c) (Mailing Threatening Communications), sent 13 threatening letters over the course of a four-year period to individuals engaged in public service, threatening their death (and in one instance, rape). In sending the letters the defendant used anti-sematic language, targeted his victims with personal details of their lives to threaten them with "maximum impact", engaged in planning, previously researched 'anthrax scares', and employed tactics to avoid detection from authorities.[9] Six of the threatening letters included white power which required hazardous materials responses and investigations and sometimes required evacuating the recipients building, isolating or quarantining people in the area, seeking medical attention, and taking prophylactic antibiotics.[10] The Court found the defendant was suffering from mental illness and intellectual disabilities which mitigated his appreciation of the severity of his action's consequences. Finding it likely that imprisonment would impose a hardship (given his mental disabilities), the Court sentenced the defendant to 5 years of probation (with the first year to be served in home detention).[11]

---

exam, used the word "shrapnel" because it sounded more dangerous and wrote, "2/4. Guess correctly," so that it would take more time for the Harvard Police Department to clear the area. *Id.*

[8]      Defendant Frisiello was in criminal history category I with a total offense level of 24 and a guideline sentencing range of 51-63 months incarceration. [Judgment, D.E. 51].

[9]      *U.S. v. Frisiello*, Government's sentencing memorandum, pp. 3-4. [D.E. 45].

[10]      *U.S. v. Frisiello*, Government's sentencing memorandum, pp. 2-3. [D.E. 45].

[11]      *U.S. v. Frisiello* Judgment [D.E. 51].

- In *United States. v. Macleod,*[12] Dkt. No. 1:19-cr-10089-PBS, the defendant, pled guilty to two counts of mailing threatening communications in violation of 18 U.S.C. § 876(c) and two counts of conveying false information related to purported biological weapons in violation of 18 U.S.C. § 1038(a)(1)(A), engaged in a "weeks long campaign to harass and threaten OKCupid and its employees using the mail". The defendant sent a series of nine threatening letters and mailings over the course of more than 12 weeks to the CEO of an online dating website. In the various threatening letters, Mr. Macleod included white power (claiming it to be anthrax)[13] that spilled out of the envelope when opened. In another, the defendant placed a piece of paper stained with a red substance that appeared to be blood, and in a subsequent threatening mailing, the defendant identified the substance as "blood infected with the AIDS virus." In further subsequent threats, the defendant mailed pieces of paper smeared with a brown substance believed to be human feces. Mr. Macleod, who suffered from PTSD, alcoholism, and other mental illness, was sentenced by the Court to <u>24 months of probation, with the first two months in a Residential Re-Entry Center and the following 8 months in home detention in a sober home with location monitoring</u>.[14]

- In *United States. v. Giordani,*[15] Dkt. No. 1:23-cr-10157-AK, the defendant was originally charged with 18 U.S.C.§§ 875(b) and 2 (aiding and abetting interstate extortion); and 18 U.S.C. § 371 (conspiracy) in connection with a series of extortionate bomb threats to Harvard University on April 13, 2023. Specifically, Mr. Giordani participated in, and then failed to report, a series of bomb threats to Harvard University. In doing so, the defendant "took steps to conceal his involvement in the bomb threat and extortion by deleting text messages, directing others not to reveal his involvement, and actively avoiding law enforcement so that he would not have to surrender evidence on his telephone and testify. [Government Sentencing Memorandum, pp. 1-2. D.E. 82]. After making the threats, Mr. Giordani's concern "was not for the safety and wellbeing of those he had helped victimize. Instead, he remained focused on getting paid for his effort, and not getting caught by law enforcement." *Id*. at p. 2.  As a result of the threats, a University-wide alert was sent to the Harvard community warning all to stay away from the Science Center Plaza, the plaza was cleared and cordoned-off, buildings adjacent to the plaza were evacuated, classes and a mid-term exam were cancelled, and the library was closed. Many students believed a bomb had

---

[12]    Defendant Macleod was in criminal history category I with a total offense level of 12 and a guideline sentencing range of 10-16 months incarceration. [Government Sentencing memorandum, D.E. 46].

[13]    In this threat, the defendant included the "harrowing" message "Welcome to the wonderful world of ANTHRAX". [Government Sentencing memorandum, D.E. 46].

[14]    *U.S. v. Macleod* Judgment, pp. 1, 4. [D.E. 52].

[15]    Defendant Giordani was in criminal history category III with a total offense level of 9 and a guideline sentencing range of 8-14 months incarceration. *Government Sentencing Memorandum,* p.4. [D.E. 82].

detonated (given law enforcement's use of a "precision water cannon"). Although Mr. Giordani did not suffer from major mental illness or intellectual disabilities, Mr. Giordani suffered from a lifelong battle with a substance use disorder, and his addiction issues "drove his need for cash and deprived him of reasonable judgement", which resulted in his offending behavior in the case.[16]
Ultimately, Mr. Giordani pled guilty to misprision of a felon (pursuant to a plea agreement) and received a <u>sentence of 3 years of probation</u>.

The Court's sentence in *United States v. Linder*, Dkt. 1:22-cr-10354-WGY, offers further support that, for Ms. Leavy, a sentence of probation is "sufficient but not greater than necessary" to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). *Linder* involved the prosecution of an out-of-state defendant, who, as a result of the spread of August 2022 disinformation falsely claiming health care providers were forcing hysterectomies and gender affirmation surgery on patients under 18 years of age, made a threatening call to a health care provider in Massachusetts. Linder targeted a specific doctor at The National LGBTQIA+ Center, threatening them first in a voicemail,[17] and then continuing to attempt contact by placing multiple additional calls to Rhode Island University where the doctor taught *and* placing a further call to the doctor's former medical practice.[18] Mr. Linder pled guilty to one count of 18 U.S.C. § 875(c) and, pursuant to the parties plea agreement, was sentenced to 3 months of incarceration and 36 months of supervised release.[19] Unlike Ms. Leavy, Linder did not suffer from mental illness nor did he have any intellectual or developmental disabilities, but was, instead, a high-functioning, college-educated father of two, with a full-time career in a family

---

[16]     *U.S. v. Linder*, Government Sentencing Memorandum, p. 4. [D.E. 82].
[17]     Linder's threat to the victim doctor stated:
> "You sick motherfuckers, you're all gonna burn. There's a group of people on their way to handle [Victim 1]. You signed your own warrant, lady. Castrating our children. You've woken up enough people. And upset enough of us. And you signed your own ticket. Sleep well, you fuckin' cunt."

*U.S. v. Linder*, Government Sentencing Memorandum, p. 2. [D.E. 63]
[18]     *U.S. v. Linder*, Government Sentencing Memorandum, p. 2. [D.E. 63].
[19]     *Linder* Plea Agreement, p. 3. [D.E. 56].

owned business, who enjoyed a stable and, by all indications, privileged, existence in a small Texas town (originally founded by members of Linder's family).[20] In stark contrast, Ms. Leavy's decision to place her sole call to Children's was impulsive, lacked any rational reflection or forethought, and was made in the throngs of a serious mental health break. It was, unfortunately, a biproduct of her mental illness and seriously disorganized thinking and is fundamentally dissimilar to the circumstances surrounding Linder's fully coherent, fully functional, rational state-of-mind at the time of his *multiple* calls to the doctor he targeted.

### 5.  <u>A Just Sentence</u>

Under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). The sentence must: 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2).

Resolution of Ms. Leavy's case with a sentence of probation is warranted here, where she is "not a rational criminal that needs to be incapacitated to prevent her from committing future harm, but rather is a young woman who was reeling from fear, seclusion, and media influences which exacerbated her underlying anxiety and paranoia." *Exhibit A at 4.*

For Ms. Leavy, a sentence of incarcerated time would carry severely negative consequences that "would exacerbate Ms. Leavy's mental health symptoms", place her "at extreme risk for victimization", and "likely cause long-term severe social and psychological

---

[20]     *U.S. v. Linder*, Defense Sentencing Memorandum, p. 2 [D.E. 62].

harm to Ms. Leavy, which would only increase her risk of future legal involvement." *Id.* at 3. Ms. Leavy contends that a probationary sentence, providing for supervision and continuation of her serious mental health conditions, will satisfy the goals of sentencing while avoiding the significant collateral damage a sentence of incarceration would inflict on her life and wellbeing, the wellbeing of her family, and the community at large. Further, Ms. Leavy's own guideline calculation supports such a resolution.[21]

The requested probationary sentence reflects the seriousness of the offense, promote respect for the law, and provide just punishment Ms. Leavy is now, at thirty-eight years old, a convicted felon, a status that will likely have repercussions throughout her adult life. Prior to the instant offense, Ms. Leavy had never been convicted of a crime. Now, however, she has been convicted of a federal felony, faces thousands of dollars in restitution, and is confronting the possibility of a carceral sentence.

It must not be ignored that a felony conviction changes one's status in this country forever. It comes with significant collateral consequences. Her rights to serve on a jury, to obtain loans, and to obtain many federal benefits may be restricted temporarily or removed permanently. Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012)

---

[21]   Ms. Leavy's guidelines are low and support a non-carceral resolution to her case. As Ms. Leavy has no countable criminal history, she is in criminal history category I. *PSR* at ¶¶ 33-34. With zero criminal history points, she is in a group which is noted to have the absolute *lowest* recidivism rates. (Data collected by the Sentencing Commission, demonstrates that offenders with zero criminal history points, like Ms. Leavy, have a lower recidivism rate than offenders with even one criminal history point. Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6–9 (2017).

("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir.  1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

The fact that she has been prosecuted for a felony offense in federal court, and will live with that felony conviction forever, serves to reflect the seriousness of the offense and promote respect for the law, and as Ms. Leavy has never previously been convicted of a crime, she doesn't require the lengthier sentence that might be necessary for someone who has been unimpacted by a prior sentence. It must also be noted that a sentence of probation does not entail the absence of punishment. As the Supreme Court noted in *Gall*, in upholding the sentencing court's imposition of probation on a defendant whose GSR was 30-37 months imprisonment, "offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." 552 U.S. 38, 48 (2007).

Moreover, Ms. Leavy has already received a substantial collateral punishment for her conduct in the form of the extreme stress and exacerbation of mental health symptoms which she has endured throughout the pendency of this case. As documented by LICSW Coughlin, Ms. Leavy has remained steadfast in her psychological and psychiatric treatment since being charged in this case. *Exhibit B*, p. 4; *PSR* at ¶ 47. Despite this, she has not been immune to the impact the

stress of this prosecution has exacted on her. *See PSR* at ¶ 48. Most notably, in January of this year, due to the mounting pressure she experienced in relation to this case and on-going prosecution, Ms. Leavy began experiencing more severe symptoms related to her many psychological illnesses. She began to spend "hours in her room crying and became overwhelmed with feelings of guilty and fear of incarceration." *Exhibit B* at 2. Unfortunately, while experiencing "an increase in paranoia, depression, and feelings of suicidality," Ms. Leavy engaged in self-harming, suicidal behaviors. *Id*. As a result, she then required an eight-day psychiatric hospitalization. *Id*; *PSR* at ¶ 48. As several courts have recognized, collateral consequences of conviction are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution).

Ms. Leavy also suggests that the interests of specific deterrence and protecting the public from further crimes can be best served by closely monitoring her compliance with mental health treatment. Since being placed on pretrial supervision, Ms. Leavy has responsibly and consistently attended to her mental health treatment and has complied with practically all terms of release for the last 20 months, demonstrating she is amenable to supervision and will comply

with conditions of probation set by the Court. An additional 12 months[22] of federal supervision will continue to provide her with the support and structure she needs, most critically in the form her of continued psychiatric and psychological care. As the true linchpin in deterring future criminal conduct is Ms. Leavy's continued mental health treatment compliance for her mental illness, such treatment, along with her continued stabilization and support in the community, will protect both the state and the public by lessening the likelihood of recidivism. Indeed, Scientific research on the relationship between mental health treatment and recidivism suggests that mental health treatment significantly reduces the likelihood of recidivism. Jeffrey Abracen, et al., *Individual Community-Based Treatment of Offenders with Mental Illness- Relationship to Recidivism*, Journal of Interpersonal Violence, Vol. 31:10 (2015)[23]; See also Zgoba, Reeves, Tamburello, & Debilio, *Criminal Recidivism in Inmates with Mental Illness and Substance Use Disorders*, American Academy of Psychiatry and the Law 48:2 (2020)[24](summarizing research to date that better engagement in treatment for persons with mental illness on re-entry reduces the risk of committing a serious crime).

---

[22]    The efficacy of longer, and onerous, periods of probation has been called into question by recent studies. In fact, some research shows that it may be counterproductive. A 2020 report from Pew Charitable Trusts notes that a growing list of high-quality studies have shown that long probation sentences are not associated with lower rates of recidivism and are more likely than shorter ones to lead to technical violations. "States Can Shorten Probation and Protect Public Safety," (Dec. 2020), https://www.pewtrusts.org/en/research-and-analysis/reports/2020/12/states-can-shorten-probation-and-protect-public-safety. The report notes that many people on supervision serve longer terms than are necessary for public safety. *Id.* For example, an analysis of data from Oregon and South Carolina showed that, among people who were on probation for a year without being arrested, more than 90% could have spent less time on supervision without an impact on recidivism. *Id.* Another article surveyed several studies that demonstrate more intensive or longer supervision terms do not improve recidivism. Lopoo, Schiraldi, and Ittner, "*How Little Supervision Can We Have?*", 6 Annual Review of Criminology 23-42 (Jan. 2023).

[23]    Available at: https://journals.sagepub.com/doi/10.1177/0886260515570745?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%20%200pubmed

[24]    Available at: http://jaapl.org/content/48/2/209.long

Given Ms. Leavy's serious psychological and psychiatric needs, and the paramount importance of her maintaining the same quality of treatment and continuity of care - a probationary sentence will ensure she continues to receive her needed medical and psychiatric treatment in the most effective manner possible. It is a "matter of settled fact that the Bureau of Prisons is not the best place for anyone to receive medical care." *United States v. Israel*, 2019 WL 6702522 *9 (S.D.N.Y. 2019).   The Bureau of Prisons (BOP) has faced persistent medical staffing challenges and some BOP institutions suffer vacancy rates of 40% or higher; in some instances, the already depleted medical staff is assigned guard duties and other security-related tasks drawing them away from medical duties. *See* Office of the Inspector General, U.S. DOJ, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, March 2016[25]; USA Today, *Nurses Thrust Into Guard Duty at Federal Prisons*, April 26, 2016.[26] Moreover, the overt nature of Ms. Leavy's disabilities would likely ostracize her and make her uniquely vulnerable to harassment or worse. Currently, Ms. Leavy attends weekly one-on-one psychological therapy, and bimonthly to monthly psychiatric appointments, so that she can manage the many faucets of her mental illness. *Exhibit B*, p. 4. The requested sentence would permit her to continue working with her treatment providers with whom she has an established relationship and allow her continued access to one-to-one therapeutic treatment, which would most likely not be available to her in a carceral setting. Instead, the requested sentence will allow Catherine to continue the successful momentum she has gathered in her life, while still holding her responsible for her behavior underlying this case, providing her with on-going supervision and structure to ensure she continues on her path of success and growth, without derailing her life and the significant

---

[25]     Available at: https://oig.justice.gov/reports/2016/e1602.pdf
[26]     Available at: https://www.usatoday.com/story/news/nation/2016/04/26/nurses-federal-prisons-public-health-service-security/83517298/

positive growth she has achieved since being charged in this case. Indeed, as articulated by Boston Children's Hospital, an incarcerated sentence will not serve Ms. Leavy, BCH, or the community, as Ms. Leavy herself has "acknowledged her wrongdoing and has taken steps to rectify it", while "the real culpable individuals in this case are the [] instigators who have orchestrated this disinformation campaign unabated for the past two years". *See Exhibit C*, pp. 6-7.

## CONCLUSION

For the foregoing reasons, Ms. Leavy asks the Court to consider her significant cognitive and psychiatric challenges, how they have affected the trajectory of her life, as well as her offense conduct in this matter, and conclude that they weigh in favor of a probationary sentence. Such a sentence is "sufficient but not greater than necessary" to do justice in this case. She asks the Court to impose no fine, as she lacks the means to pay one.

Respectfully Submitted,

Ms. Catherine Leavy,
By Her Attorney,

*/s/Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
BBO # 674760
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Forest O'Neill-Greenberg hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on June 17, 2024.

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg